IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 15, 2002

## JAMES E. JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 97-D-2591     Steve R. Dozier, Judge**

_____

**No. M2001-02005-CCA-R3-PC - Filed December 6, 2002**

_____

The petitioner, James E. Jackson, appeals the trial court's denial of his petitions for writ of error coram nobis and post-conviction relief from his conviction for first degree murder. In regard to the petition for writ of error coram nobis, the petitioner claims that newly discovered evidence entitles him to a new trial. In regard to the petition for post-conviction relief, he contends that he received the ineffective assistance of counsel because his trial attorney failed to call certain witnesses to testify and did not investigate and present a diminished capacity defense. We affirm the trial court's denial of the petitions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and JAMES CURWOOD WITT, JR., JJ, joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, James E. Jackson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jon P. Seaborg, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the petitioner's shooting and killing the victim. This court's opinion in the petitioner's appeal of his conviction for premeditated first degree murder recounts the following facts:

> During the late afternoon to early evening hours of August 18, 1997, David Sanders was sitting on the common porch in front of his and the defendant's apartments in a Nashville housing project. The victim approached Sanders and inquired whether Sanders had seen the defendant. Sanders responded that he had. The victim went into

his apartment across a common area and returned a few seconds later. By this time, Sanders' girlfriend, Louise Horton, was also outside on the porch. The victim told Sanders that the defendant had caused the victim to have an argument with his girlfriend over a note the victim left for the defendant. The victim explained that the defendant was supposed to have paid him some money [for a motorcycle] the previous Friday, and the victim left a note which said he wanted to see the defendant when the defendant got home. The victim proceeded to knock on and lightly kick the Jacksons' front door. Sanders did not think the victim was agitated.

When there was no answer at the door, the victim turned around and started back to his apartment; however, the defendant opened the door and called to the victim. The two men began discussing a note the victim left on the defendant's door and the motorcycle debt. The victim explained that he left the note because the defendant had failed to pay him on Friday, and he wanted to see the defendant about this failure to honor the obligation. . . . The defendant offered to pay the victim $50, which the victim declined because their agreement had been otherwise. The defendant asked the victim to come inside his apartment to discuss the situation, and the victim said there was no reason to come inside the defendant's apartment unless the defendant had the money. Sanders heard the victim say, "You ain't nothing but a big liar. I ought to take it out on you're a--." The victim then said it would not be "worth it" and then proposed to "take it out" on the defendant's car, but he commented that this would not be "worth it," either. According to Sanders, during this entire exchange the victim was standing still on a step by the sidewalk or the porch.

The defendant asked Sanders whether there was anyone with the victim, and neither Sanders nor Horton responded. The victim commented that the defendant would need a favor from him sometime, and "f--- it." The victim turned toward his apartment and began walking away. The defendant opened the door, ran outside and said, "Hey, Mike." The victim turned around, and the defendant shot him in the leg. The victim fell, and the defendant continued shooting him. The defendant ran off, but he returned within fifteen to twenty seconds and said to the people who were assembling, "Y'all, n------, get out of the way, I'm fixing to kill this n-----." Sanders told the defendant he was not going to shoot the victim again, and the defendant ran away.

-2-

State v. James E. Jackson, No. 01C01-9809-CR-00358, Davidson County, slip op. at 2-4 (Tenn. Crim. App. Sept. 10, 1999), app. denied (Tenn. Feb. 22, 2000). A jury convicted the petitioner, and the trial court sentenced him to life in prison.

At the evidentiary hearing, Linda Darden, who lived in the same housing project as the petitioner and the victim, testified that on August 18, 1997, she was in her living room and heard a gunshot. She said she ran outside, saw the victim lying on the ground, and saw the petitioner running away from the victim. She said that the victim was about ten feet away from her and that she saw a man she knew as "Wibble Wobble" take a handgun off of the victim's body and run away. She said she could not tell whether Wibble Wobble took the gun out of the victim's pocket or the victim's hand. She said that she never spoke to the petitioner's trial attorney and that she did not want to testify at the petitioner's trial because she was afraid of the victim's family. She said the victim was a drug dealer, did not have a good reputation, and often carried a gun. On cross-examination, Ms. Darden testified that she talked to a police officer after the shooting and told him that she had seen someone take a gun off the victim. She said she could not remember the officer's name.

Leon Enmon testified that his nickname was Wibble Wobble and that he saw the petitioner shoot the victim. He said that before the shooting, he spoke with the victim and the victim had a gun in the victim's pocket. He said that the victim asked if he had seen the petitioner and that he told the victim he had seen the petitioner inside the petitioner's apartment. He said the victim went into the victim's apartment and came outside. He said the victim walked over to the petitioner's apartment and knocked on the petitioner's door. He said that the petitioner opened the door and that he walked toward the victim and the petitioner. He said that the victim and the petitioner were talking to each other but that he could not hear what they were saying. He said that after they talked for ten or fifteen minutes, the victim walked away from the petitioner. He said the petitioner came out of the apartment and said something to the victim. He said the victim turned around, the petitioner shot the victim, and the victim fell.

Mr. Enmon testified that he did not take a gun off the victim's body. He said that he and the victim were friends and that the victim often helped him. He said that the victim sold drugs and that people respected the victim but did not fear him. He said that he did not talk to the police but that he talked to the petitioner's trial attorney. He said he told the petitioner's attorney that the victim had a gun at the time of the shooting. He said he was in the hospital during the petitioner's trial and did not know that the petitioner's trial attorney had wanted him to testify.

On cross-examination, Mr. Enmon testified that although the victim had a gun, the petitioner shot the victim before the victim could pull it out of his pocket. He said that when the petitioner shot the victim, he did not see a gun in the victim's hand. He said that at the time of the hearing, he was serving an eight-year sentence for drug possession. He said he also had four prior convictions, including one for possession of cocaine.

The petitioner's retained trial attorney testified that he became licensed to practice law in 1987. He said that at the time of the petitioner's trial, he had been practicing criminal defense law for about seven years and that he had tried two murder cases. He said he spent considerable time investigating the petitioner's case and going over the case with the petitioner. He said he filed motions, met with the victim's family, reviewed the state's discovery materials, and had an investigator from the medical examiner's office review the victim's autopsy report. He said he had to investigate most of the case himself because the petitioner's family could not afford to hire a private investigator. He said that he talked with the petitioner about trial strategy and that the defense's main theory of the case was that the petitioner committed voluntary manslaughter. He said that although the trial court instructed the jury on self-defense, he did not want to rely on a self-defense theory because eyewitnesses saw the petitioner shoot the victim as the victim was walking away from the petitioner and because the petitioner shot the victim nine times.

The petitioner's attorney testified that based on the petitioner's family history and his conversations with the petitioner, he did not think the petitioner had an insanity defense. He said, though, that he would have liked to have explored a diminished capacity defense but that the petitioner's family could not afford a psychological assessment for the petitioner. He said that the petitioner suffered a severe head injury when the petitioner was fifteen years old and that sometime before the shooting, the petitioner tried to hurt himself. He said that he talked to the petitioner's family about the petitioner's psychological problems and that the petitioner had never seen a psychiatrist. He said that although the petitioner was under stress and taking medication while in jail and awaiting trial, the petitioner was very perceptive and was able to recall facts and details about the case. He said that he felt prepared for trial and that the petitioner did a good job testifying for the defense. He said that he did not interview the petitioner's doctors at the jail or the staff psychologist.

The petitioner's attorney testified that he approached the state and offered for the petitioner to plead guilty to voluntary manslaughter and be sentenced outside of his range of punishment. He said the state rejected the offer and indicated that it might consider a guilty plea to second degree murder. He said that the state never formally offered a plea to second degree murder and that the petitioner did not want to plead to second degree murder anyway.

The attorney testified that he was aware of Linda Darden but did not interview her. He said that she had claimed to have heard the victim was carrying a weapon at the time of the shooting and that he did not call her to testify because he thought her testimony would be inadmissible hearsay. He said he talked with the petitioner about Ms. Darden but did not know that she had seen someone take a gun off the victim's body. He said that if he had had that information, he would have called her as a witness and her testimony would have been helpful to the defense. He said, though, that nothing in the state's discovery materials indicated that she had seen Leon Enmon take a gun off the victim. He said that he interviewed Leon Enmon and that Mr. Enmon first denied being at the crime scene. He said that later, Mr. Enmon admitted witnessing the shooting. He said that Mr. Enmon told him the victim had a gun on his person at the time of the shooting but that Mr. Enmon denied taking the gun off the victim's body.

The attorney testified that he did not call Mr. Enmon to testify at trial because Telisa Bingham, the petitioner's neighbor, appeared to be a more credible witness than Mr. Enmon and was also going to testify that the victim had a gun at the time of the shooting. He said that at trial, Ms. Bingham testified that before the shooting, the victim appeared to have a pistol in his pants pocket and was banging on the petitioner's door. He said that Ms. Bingham was less assertive at trial than she had been in his interview with her and that he was disappointed with her testimony. He said that in addition to Ms. Bingham, the petitioner testified that the victim had a weapon in his pocket and the petitioner's wife testified about the victim's leaving threatening notes on the petitioner's door. He said that through Ms. Bingham's, the petitioner's, and Mrs. Jackson's testimony, the defense suggested to the jury that the victim had a weapon in his pocket at the time of the shooting. He said he also tried to show through police officers' testimony that someone had time to take a gun off the victim before the police arrived at the crime scene.

The attorney acknowledged that during his investigation of the case, the petitioner or the petitioner's wife told him that while the victim and the petitioner were talking at the petitioner's front door, a man named Tim Barbee was guarding the petitioner's back door. He said that he could not locate Mr. Barbee before trial and that he could not remember what kind of effort he made to find Mr. Barbee. He said that at trial, the petitioner's wife testified that she and her children could not leave the apartment during the victim's confrontation with the petitioner because Mr. Barbee was at her back door. He said that if he could have found Mr. Barbee, Mr. Barbee's testimony could have been helpful to the defense.

On cross-examination, the attorney testified that he introduced into evidence the victim's threatening notes to the petitioner. He said that he thought Ms. Bingham was a more credible witness than Mr. Enmon because she was employed and did not have a criminal history. He said that he was not sure how Mr. Enmon would testify and that he was concerned about calling Mr. Enmon as a witness.

The petitioner testified that his trial attorney visited him in jail about four times. He said his attorney talked about his trial but did not talk about how the attorney was going to defend his case. He said that he gave his attorney the names of Telisa Bingham, Linda Darden, Leon Enmon, Debbie Welch, Wanda Starks, and Ricky Saver but that he did not know if his attorney interviewed them. He said that after the shooting, he began hallucinating and having nightmares. He said that he could not sleep and would be awake for four or five days. He said that while he was in jail and awaiting trial, he took medication that made him drowsy and affected his ability to understand things. He said he told his attorney that he was taking medication and did not understand a lot of the questions the attorney was asking him. He said he did not understand what his attorney told him about his case or what happened at trial. He said that although he did not understand what was happening, his attorney called him to testify.

The petitioner testified that his attorney said something about manslaughter and settling his case. He said that he would have pled guilty to second degree murder in return for a fifteen- to twenty-year sentence. He acknowledged that it was possible his attorney discussed a plea offer with

him and that he could not remember it because of the medication he was taking. He said that the day before trial, his attorney told him the state was not going to make a plea offer. He said that he could not remember what happened during the shooting and that in 1997, he tried to commit suicide by cutting his wrists. He said that he asked his attorney for a psychological evaluation but that the attorney said he did not need one.

On cross-examination, the petitioner acknowledged that he testified about details of his life at trial. He said that although he did not make up those details, he was drowsy during the trial. He said that he did not remember testifying at trial about the conversation he had with the victim before the shooting. However, he acknowledged testifying at trial that he was scared of the victim and got a gun out of his closet. He said the victim had a .38 caliber handgun in the victim's pocket before the shooting.

Upon being questioned by the trial court, the petitioner testified that he knew before his trial that Linda Darden had seen Leon Enmon take a gun off the victim and that he told his attorney about it. The trial court also questioned the petitioner's trial attorney. The attorney testified that he did not call Debbie Welch to testify because she was the victim's girlfriend and would have been a hostile witness. He said he did not call Wanda Starks to testify because he did not know that she had any information that was important to the petitioner's case. Finally, he said he did not remember the petitioner giving him Ricky Saver's name. The trial court denied the petitioner's petitions for writ of error coram nobis and post-conviction relief.

## I. PETITION FOR WRIT OF ERROR CORAM NOBIS

The petitioner claims that the trial court erred in denying his petition for writ of error coram nobis. Specifically, he contends that Ms. Darden's and Mr. Enmon's unequivocal testimony that the victim had a gun on his person at the time of the shooting "might well have weakened the State's case to such an extent that the jury would have credited the defense theory of provocation and self-defense." While he acknowledges that Telisa Bingham testified about the victim's appearing to have a pistol in the victim's pocket, he argues that she was not very assertive in her testimony and that Ms. Darden's and Mr. Enmon's testimony would have "asserted a much stronger case of self-defense than that presented at trial." He claims that he was not at fault for not presenting Ms. Darden's and Mr. Enmon's testimony at trial because he told his trial attorney about the witnesses but "either through neglect or misunderstanding," his attorney did not subpoena them. We believe the trial court properly dismissed the petition.

In denying the writ of error coram nobis petition, the trial court stated that Ms. Darden's testimony did not constitute new evidence because the petitioner testified at the evidentiary hearing that he knew before his trial that Ms. Darden had seen a weapon on the victim. In addition, the trial court held that the petitioner also knew before his trial that Mr. Enmon had seen the victim with a gun before the shooting. The trial court stated that, in any event, Ms. Darden's and Mr. Enmon's testimony would not have affected the outcome of the petitioner's trial because the petitioner and

Telisa Bingham testified that the victim had a gun before the shooting and because there was no evidence that the victim pulled the gun out of his pocket before the petitioner shot him.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105; State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The decision to grant or deny such a writ rests within the sound discretion of the trial court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988), cert. denied 493 U.S. 874, 110 S. Ct. 210 (1989). In exercising its discretion, the trial court must determine the credibility of the witnesses who testify in support of the petition for writ of error coram nobis. Hart, 911 S.W.2d at 375.

Upon considering the testimony of the witnesses, the trial court believed the petitioner's testimony that he knew before his trial about Ms. Darden's and Mr. Enmon's having seen the victim with a gun before the shooting. Therefore, it properly determined that their information was not new evidence. We also agree that the trial court properly held that even if Ms. Darden's and Mr. Enmon's information constituted new evidence, it would not have affected the outcome of the trial. As noted by the trial court, the jury heard Telisa Bingham and the petitioner testify about the victim's having a gun on his person at the time of the shooting. Moreover, no evidence at trial suggested that the victim brandished the weapon at the petitioner. To the contrary, the evidence shows that as the victim was walking away from the petitioner, the petitioner called to the victim and shot him. At trial, a forensic pathologist testified that the victim had been shot ten times. Accordingly, we conclude that the trial court did not abuse its discretion by denying the petition for writ of error coram nobis.

## II. PETITION FOR POST-CONVICTION RELIEF

Next, the petitioner claims that he received the ineffective assistance of counsel because his trial attorney failed to call significant witnesses such as Linda Darden, Leon Enmon, and Tim Barbee to testify. In addition, he claims that his attorney was ineffective for failing to investigate and present a diminished capacity defense. The state claims that the petitioner received the effective assistance of counsel. We conclude that the petitioner has failed to demonstrate that he is entitled to relief.

In denying the petitioner post-conviction relief, the trial court accredited the attorney's testimony that he did not call Ms. Darden as a witness because he did not know that she had seen Mr. Enmon take a gun off the victim and because he thought she was going to testify only as to hearsay evidence. In addition, the trial court held that even if the petitioner's attorney rendered deficient performance by failing to call Ms. Darden as a witness, the deficiency would not have affected the outcome of trial. As to Mr. Enmon's testimony, the trial court ruled that the petitioner's attorney made a tactical decision not to call him as a witness. As to the petitioner's claim that his attorney failed to call other witnesses to testify, the trial court noted that the petitioner failed to present any evidence as to what those witnesses would have said at trial. Finally, the trial court addressed the

petitioner's claim that his attorney was ineffective for failing to investigate and present a diminished capacity defense. Again, the trial court accredited the attorney's testimony that nothing indicated that the petitioner could not understand his case or help prepare his defense. The trial court held that the petitioner received the effective assistance of counsel.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). We review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

In this case, the trial court accredited the trial attorney's testimony as to why he did not call Ms. Darden and Mr. Enmon as witnesses, and we believe the petitioner has failed to demonstrate that his attorney rendered deficient performance for his failure to have them testify. As to the petitioner's claim that his attorney also was deficient for failing to call witnesses such as Mr. Barbee to testify, the petitioner failed to present the testimony of these witnesses. Without any proof at the post-conviction hearing as to the testimony that these witnesses would have offered, the petitioner cannot demonstrate that he was prejudiced by their failure to be interviewed or called on his behalf. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Similarly, although the petitioner claims that his attorney was ineffective for failing to investigate and present a diminished capacity

defense, no mental health experts testified at the evidentiary hearing. Therefore, the petitioner has failed to provide any evidence that his attorney was deficient for failing to explore this defense. We conclude that the petitioner has failed to show that he received the ineffective assistance of counsel.

Based on the foregoing and the record as a whole, we affirm the trial court's denial of the petitions for writ of error coram nobis and post-conviction relief.

 

 

_____
JOSEPH M. TIPTON, JUDGE